IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2014

**STATE OF TENNESSEE v. JAN MICHELLE ELL**

**Appeal from the Circuit Court for Blount County**
**No. C-21225   Tammy Harrington, Judge**

**No. E2013-01624-CCA-R3-CD - Filed June 25, 2014**

The Defendant, Jan Michelle Ell, was convicted by a Blount County Circuit Court jury of especially aggravated robbery, a Class A felony, and conspiracy to commit especially aggravated robbery, a Class B felony. *See* T.C.A. §§ 39-13-403, 39-12-103 (2010). The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of twenty-two years for the especially aggravated robbery conviction and twelve years for the conspiracy conviction. On appeal, the Defendant contends that the evidence is insufficient to support her convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk (on appeal), Knoxville, Tennessee, and Mack Garner, District Public Defender (at trial), for the appellant, Jan Michelle Ell.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Michael L. Flynn, District Attorney General; and Kenlyn Foster, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the robbery of James Anthony Tripplett. At the trial, Blount County Sheriff's Deputy Billy Madore testified that on May 9, 2012, he was dispatched to Williams Mill Road and that he found the victim lying on the ground near a shed where the victim had been sawing wood. He said the victim was lying in a pool of blood and had an injury to his arm. He said the victim complained of a broken arm and a head injury. The

victim told him that he was standing with his back to the road when a "male came up and attacked him."

Deputy Madore testified that the person who called 9-1-1 was at the scene when he arrived, although he did not recall who the person was. He said his supervisor arrived at the scene and called for a K-9 unit to look for suspects. He said the victim stated that the man who attacked him was eighteen or nineteen years old but that he did not know him. He said the victim told him that he fell after he was struck and that he saw "them" run behind the building. The victim told him that he thought a woman was there.

On cross-examination, Deputy Madore testified that from where he found the victim, a picnic table was within the victim's reach. He said wood and a "power saw" were on the table. He did not know if the saw was still plugged in but said it was not on when he arrived. He did not investigate whether the saw had a trigger or worked continuously.

The victim testified that he rented property on Williams Mill Road where he and his friends visited. He knew the Defendant as Janet Hurst and had known her for about one and one-half years. He said he first met the Defendant when she stopped by the shop and claimed she was out of baby formula and diapers for her child or grandchild. He said he gave the Defendant $15 or $20 for the items she needed. He said he saw the Defendant once a month thereafter.

The victim testified that he purchased wood, junk, and old scrap iron from the Defendant. He said that on one occasion he paid the Defendant $80 for a truckload of wood, but the Defendant failed to deliver it. He said that he purchased two additional truckloads of wood and that the Defendant delivered it the day he was attacked. He said he paid Tiffany Dalton, the Defendant's daughter, for the wood. He said Ms. Dalton and "a boy," whom he did not know, came with the Defendant to deliver the wood. He said he paid $100 for the wood and pulled the money from his wallet when the wood was delivered. He said he carried $600 or $700 most of the time.

The victim testified that on the day he was injured, the Defendant and two other people arrived with the wood and unloaded it, which took about thirty minutes. He said they left, returned with the second load of wood sometime later, which also took about thirty minutes to unload, and left again. He said that a friend stopped at the shop, that they talked for about thirty minutes, and that his friend left. He denied seeing the Defendant use the telephone when she was there. He said he was struck in the head with a metal pipe about thirty minutes after the Defendant and the other people left.

-2-

The victim testified that he was cutting wood with his back toward the road when he was struck in the head and fell to the ground. He said he saw a shadow of a tall, slim man. He said the man struck him four or five times from his "shoulder though []his elbow." Although the man did not speak, the victim asked the man to stop striking him. The man took his wallet and left, and the victim called for help. He said that after he fell to the ground, the man disconnected the chain from his wallet to his belt, took his wallet containing his credit cards and other things, and went around the corner of the building.

The victim testified that he was in pain and bled from his injuries, although he did not lose consciousness. He denied he was able to stand and said he was transported to the hospital on a gurney. He said he learned later that his arm was broken in two places. Regarding his head injury, he said, "They . . . felt just like I had blacked out just for a second." He said he thought the saw electrocuted him after the first strike to his head. He stayed overnight at Blount Memorial Hospital. He said he received five stitches, and he was required to wear a sling for his arm. He said his arm continued to hurt, and he thought it had arthritis. He said that he could no longer use his arm but that he had broken his shoulder previously, which never healed right and developed arthritis. The victim's medical records were received as an exhibit.

The victim's medical records showed that he was eighty-six at the time of the attack. The victim's injuries were classified as "Level 3 - Urgent," and he suffered a broken distal humerus fracture, an elbow laceration with suture repair, a fractured wrist, a closed head injury, and multiple contusions. The injury to his left arm was considered "significant." He reported no loss of consciousness but said he had head and neck pain. The victim had a hematoma to the head, a mild headache, and mild dyspnea. He received a splint/cast for his left arm and wrist. He received wound care to his left elbow, including dressings and neosporin. The nuerovascular exam was normal before and after the victim received treatment. He developed "significant" bruising and swelling in his left hand and arm and complained of moderate pain. The records show that before the assault, the victim had a history of asbestosis, hypertension, diabetes, atrial fibrillation, congestive heart failure, a shoulder fracture, chronic back pain, coronary artery disease, chronic renal insufficiency, benign prostatic hypertrophy, and renal calculi.

The victim testified that when he paid the Defendant, Ms. Dalton, and the boy for the wood, he pulled the money from his three-fold wallet, which contained about $800. He said the three-fold wallet was his second wallet and separate from the wallet containing his cards. He agreed the Defendant watched him pull out his wallet. Regarding the previous times he paid the Defendant, he said he paid her with money from the same wallet.

The victim testified that the Defendant promised to deliver a truck containing cedar wood and old junk air conditioners but that the Defendant never delivered the things, although he paid her for them. He said he paid her $128 for a radiator and $90 for a busted tire he never received.

On cross-examination, the victim testified that his wallet holding his credit cards was larger than a regular wallet. He said the three-fold wallet was beige and the other wallet, which was taken, brown. He said that he always kept his money in and paid the Defendant with money from the three-fold wallet.

The victim testified that he paid the Defendant about eight times during the length of time he knew her. He said he was expecting the Defendant on the day of the attack because she called him that morning. He said his friend, Johnny Dossett, arrived before the Defendant, Ms. Dalton, and the boy finished unloading the wood. He said Mr. Dossett left immediately after they left. He said that after Mr. Dossett left, he began using the saw and was struck on the head.

The victim testified that the saw was electric and stopped working automatically for safety when the trigger was not pressed. He said that he was in the process of sawing a piece of wood when he was struck in the head. He denied seeing who hit him but said he saw the man after he fell to the ground. He knew it was a man who hit him, not a woman, and said he did not see anything in the man's hands. He did not know with what the man struck him.

The victim testified that the man cut the wallet chain from his pants but that he did not know if the man had a knife. He said that the loop in his pants had been cut when he looked at his pants afterward. He said he saw the man reach toward his wallet. He denied seeing Ms. Dalton but said he thought he saw a woman, although he did not know who she was. He said that his current health was similar to his health before the attack, except for the arthritis. He agreed he had "recovered pretty well." He said he did not lose any money from the incident because his three-fold wallet was not taken.

On redirect examination, the victim testified that although he did not recall the time the Defendant delivered the wood, it was early afternoon. He said the Defendant called him a "poor specimen of a man" because he did not help them unload the wood. He said he was not capable of unloading it because of a back injury. He said he kept his wallets in opposite sides of his pants.

The victim testified that Mr. Dossett was seventy-six years old, 6' tall, and white-headed. He denied Mr. Dossett looked like the person who struck him. Although he did not see what struck him, he thought it was a stick. He said that the attack happened quickly and that he was dizzy afterward. He denied he was injured by his saw.

Lester Caughorn testified that he knew the victim and that his farm was across the road from where the victim was attacked. He said that on May 9, 2012, he was planting a garden on his farm and that he saw the Defendant talking to the victim and the Defendant's daughter inside their PT Cruiser when he left to buy more potting soil. He said the Defendant waved at him.

Mr. Caughorn testified that the greenhouse where he bought potting soil was about four minutes away by car and that he was inside the store for about three minutes. He said that when he returned home, he heard on his police scanner that officers were being dispatched to Williams Mill Road. He thought his cows might have escaped but said he saw police cars and an ambulance at the victim's shop. He estimated twenty minutes elapsed between the time he saw the Defendant talking to the victim and the time he saw the police cars and the ambulance. He said it was about noon when he saw the emergency responders.

On cross-examination, Mr. Caughorn testified that he did not see any young men at the victim's shop when he saw the Defendant there. He said he knew the Defendant's daughter, who waved at him. He said everyone appeared friendly and denied seeing anyone yelling or "shaking their fists." He said he could not see the victim because of the emergency responders.

On redirect examination, Mr. Caughorn testified that Larry Lonas told him the victim had been assaulted and that his first thought was seeing the Defendant and her daughter at the victim's shop. He said he called the police department and told Detective Davis who and what he saw at the victim's shop.

Tiffany Dalton, the Defendant's daughter, testified that she was a codefendant in the present case, that the State had not offered her leniency in exchange for her testimony, and that she was testifying because the victim deserved justice and because she blamed her mother for being involved in this case. She said that at 10:00 a.m. on May 9, 2012, she took her father to work and took the Defendant to St. Mary's Hospital at 10:30 a.m. because the Defendant wanted to be admitted into a "detox center." She said she picked up Christian, her younger sister, and Chestin Johnstone, Christian's boyfriend, at Mr. Johnstone's house. She said the Defendant, Mr. Johnstone, and Christian dropped her off at "UT Hospital" for an ultrasound around 12:00 p.m. and returned about two hours later. She said that they returned to their apartment. She said she walked into the apartment and saw the Defendant, Christian,

and Mr. Johnstone talking. She said that the Defendant and Mr. Johnstone went outside and that she followed. She said that they drove to the victim's shop and that the Defendant left the car and used her cell phone. She said she thought the Defendant "was asking like she was using the phone" because "her phone . . . sounded strange." She said the Defendant returned to the car. She said that they drove to the Clayton Home parking lot, that the Defendant said, "Okay," and that Mr. Johnstone pulled out gloves and gave Ms. Dalton a pair. She said that she and Mr. Johnstone got out of the car, that Mr. Johnstone picked up a pole, and that Mr. Johnstone walked up behind the victim and struck him on the head and back with the pole.

Ms. Dalton testified that she watched Mr. Johnstone strike the victim and that Mr. Johnstone told the victim to roll over. She said that Mr. Johnstone stuck the victim again and that she ran. She said Mr. Johnstone "yanked" the victim's wallet and ran toward the car. She said that when they got into the car, Mr. Johnstone realized no money was inside the wallet. She said the Defendant looked at the wallet and told Mr. Johnstone he took the wrong wallet. She said the Defendant explained the victim had two wallets in separate pants pockets, threw the wallet at her, and told her to wipe off the fingerprints. She thought the engine was running when she returned to the car. She said she gave the wallet to Mr. Johnstone, who threw it out of the car. She said the Defendant stated that she wanted to return to the victim's shop to ensure the victim was okay, but Ms. Dalton thought the Defendant wanted to return for the wallet containing the money. She said that someone was already there when they returned and that they drove to their apartment. She said that she drove the Defendant to St. Mary's Hospital again, waited there for over an hour, left St. Mary's, met a man who gave them money, and "went and got a pill." She said that a detective called her and that she met him at the lake.

Ms. Dalton testified that Mr. Johnstone struck the victim three or four times. She said the Defendant spoke about robbing the victim before May 9, 2012. She said the Defendant told some of their family members and some of the Defendant's friends three or four days before the attack that she wanted to rob the victim. She said the Defendant also talked to her and Mr. Johnstone about robbing the victim and assigned them roles. She said the Defendant stated that Mr. Johnstone would strike the victim and that Ms. Dalton would grab the wallet. She said she did not call the police because she was scared. She denied asking her mother to call the police.

Ms. Dalton testified that when she first spoke to the police, she told the detective that she was not involved and that her sister was with Mr. Johnstone and the Defendant. She said she lied because she was scared and knew "the whole deal was wrong." She said that the following day, she went to the police station voluntarily, asked to speak to the detective, and

told the truth about what occurred. She said she was arrested that day. She said that she put the gloves in her pocket after Mr. Johnstone gave them to her.

Ms. Dalton testified that the Defendant offered to sell the victim wood about one month before the attack. She said that she heard the Defendant talking about the wood, that the Defendant told the victim that their truck was out of gas, the radiator "went out," and the starter broke, and that the victim "practically bought a truck that did not exist." She did not recall if the victim bled after the attack.

On cross-examination, Ms. Dalton testified that she told the detective two versions of events before telling the truth. She agreed she first told the detective that the Defendant and Ms. Dalton's sister went to the victim's shop, that the Defendant got out of the car, that the Defendant made a telephone call, that the Defendant returned to the car, and that they left. She agreed she later told the detective that the Defendant and Christian picked her up from a doctor's appointment, that they went to the victim's shop, that the Defendant got out of the car and made a telephone call, that they left and drove to a small parking area around the corner, that Mr. Johnstone appeared and was running toward their car, and that he had the victim's wallet. She agreed she also stated previously that Christian and Mr. Johnstone robbed the victim and struck him on the head. She agreed she told the detective three or four versions of the events.

Ms. Dalton testified that although she had been to the victim's shop before the attack, they did not deliver wood to the victim that day. She agreed the victim was mistaken. She said she helped deliver wood two or three days previously. She denied knowing that she, the Defendant, and Mr. Johnstone were going to the victim's shop when they left the apartment. She said she did not know the victim had two wallets until after the robbery when the Defendant told her and Mr. Johnstone inside the car. She denied the Defendant mentioned the two wallets before the robbery. She denied Mr. Johnstone had any weapons to cut the wallet from the victim's clothes during the robbery. She said that before the robbery, she "kind of figured" the plan was to rob the victim but that she did not think Mr. Johnstone would "really do it." She said Mr. Johnstone obtained the metal pole or pipe from the porch of an abandoned house next door to the victim's shop. She said the pole was a little longer than a walking stick.

Ms. Dalton testified that Mr. Johnstone walked up behind the victim, who was sawing wood, and struck the victim. She said that the victim fell to the ground, that she stood still for a few seconds, and that she ran away. She denied telling Mr. Johnstone to stop hitting the victim. She said Mr. Johnstone took the victim's wallet by yanking it from the victim's pants pocket. She denied the wallet was cut from the victim's pants.

On redirect examination, Ms. Dalton testified that she provided the detective with the false versions of the events on May 9, 2012, the day of the attack. She agreed she voluntarily went to the police station on May 10 and told the truth. She said she was afraid of her mother. She said she thought Mr. Johnstone was only acting like he was going to rob the victim in order to get the Defendant's approval.

Upon questioning by the trial court based on questions submitted by the jury, Ms. Dalton testified that the Defendant did not tell her they were going to rob the victim during the drive to the victim's shop. She denied knowing the victim was going to be robbed that day. She denied asking Mr. Johnstone what he was going to do with the pipe when he picked it up. She said she did not want to be a part of the robbery.

April Monnett testified that the Defendant was her biological mother but that she was raised by her grandmother, Virginia Hurst. She said that in March and April 2011, she and her husband lived with the Defendant in order for her husband to be closer to work. She said that during that time, the Defendant asked her and her husband to help rob the victim. She said the Defendant asked her to rob the victim on multiple occasions. She said that on one occasion, the Defendant planned to hit the victim on the head and take his money. She said that on another occasion, the Defendant just wanted to rob the victim. She said the Defendant mentioned different ways of robbing the victim. She said the Defendant later said she would have Mr. Johnstone rob the victim by threatening Christian and her unborn child. She denied hearing the Defendant threaten Mr. Johnstone. She said the Defendant wanted the victim's money but wanted someone else to rob him.

On cross-examination, Ms. Monnett testified that she and her husband were the only people present when the Defendant asked them to rob the victim. She said her father was always at work when the Defendant mentioned it. She agreed she drove the Defendant to the victim's shop previously and said the Defendant went there to "scheme" the victim for money.

David Monnett testified that the Defendant was his mother-in-law and that he had known her about seven years. He said he and his wife lived with the Defendant for two or three months the previous year. He said the Defendant wanted him to go to the victim's shop, hit him on the head, and take his money. He said the Defendant wanted him to hit the victim with a piece of wood. He told the victim he would not rob the victim.

On cross-examination, Mr. Monnett testified that he only recalled the Defendant's asking him once to rob the victim. He said that if his wife testified that the Defendant asked multiple times, he said he did not pay attention to everything and attempted to keep to himself most of the time. He said, though, he was asked to help the Defendant "scheme" the

victim out of his money. He agreed he thought the Defendant was taking advantage of the victim by promising to do something or by selling him things that were of no value. Regarding the Defendant's asking him to rob the victim, he said the Defendant described the victim's wallet as having a chain.

Blount County Sheriff's Crime Scene Investigator Jason Shudan testified that he responded to the scene after the victim was transported to the hospital. He found a metal pole behind the building. He said that a substance he thought was blood was on the pole and that three swabs were obtained from the pole and sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for analysis.

On cross-examination, Investigator Shudan testified that the metal pole was not concealed and was found quickly. He said the pole was found about 200' from the victim's table and saw. On redirect examination, he stated that he obtained a buccal swab from the victim and Mr. Johnstone during his investigation.

TBI Special Agent Forensic Scientist Kim Lowe, an expert in DNA analysis and serology, testified that she analyzed the three swabs taken from the metal pole and the buccal swabs obtained from the victim and Mr. Johnstone. She said that the substance found on the metal pole contained the victim's blood and DNA. She also found the presence of Mr. Johnstone's DNA on the pipe and said that although it was possible Mr. Johnstone touched the pipe, she could not conclude he did because the sample was degraded. Her report was received as an exhibit.

On cross-examination, Special Agent Lowe testified that DNA was contained in white blood cells and that the probability of obtaining a DNA profile from blood was much higher than the probability of obtaining a DNA profile from an object after it had been touched. She agreed that touch DNA might not transfer to an object if someone wore gloves. On redirect examination, she agreed the probability of someone in the Caucasian population matching the degraded DNA sample from Mr. Johnstone was one out of twenty-nine.

Blount County Sheriff's Detective Douglas Davis testified that he was the lead investigator assigned to the present case. After he arrived at the scene, he learned that the suspects left the scene on foot and requested a K-9 unit to search for them. He said the K-9 track led to a nearby parking area, from which he concluded the suspects got into a car. He said that along the K-9 track, a metal pipe was found. He said he left the scene and drove to the hospital to speak with the victim. He said that the victim was wearing a neck brace and that his arm was bandaged with a lot of blood coming through the bandages and onto the bed. He said that the victim was conscious and "somewhat" able to communicate. He said that the victim had welts on his side but that he could not determine the number. He said that

the victim's arm was broken and bleeding and that his left elbow protruded through the skin.

Photographs taken at the hospital were received as exhibits. One photograph showed the victim wearing a neck brace. Another showed the victim lying on a hospital gurney with his left arm wrapped in blood-soaked dressings. The bedding from the gurney also had blood on it. A third photograph showed a bruise to the victim's arm. Two additional photographs showed the victim's unbandaged arm. Although the photographs failed to show the source of the blood, the victim's arm bled heavily. A large pool of blood was on the gurney. The last photograph showed the victim's elbow, the source of the bleeding. The victim's blood-covered bone protruded from the skin.

Detective Davis testified that he spoke with Mr. Caughorn, who saw the Defendant's red PT Cruiser at the victim's shop. He said Mr. Caughorn was adamant that no one else could have arrived at the victim's shop and attacked him during the time Mr. Caughorn went to purchase potting soil. Detective Davis went to the victim's apartment and found Christian and Mr. Johnstone, who told him the Defendant was in a rehabilitation program. He asked who drove the Defendant's car, and they identified Ms. Dalton. He said he went to the Defendant's husband's place of employment. He said the Defendant's husband did not know where Ms. Dalton was but knew the Defendant was "supposedly" in a rehabilitation program. He asked the Defendant's husband to have Ms. Dalton call, and Ms. Dalton called him later that day.

Detective Davis testified that he met Ms. Dalton on May 9, 2012, and that she lied about whether she had been to the victim's shop earlier that day. He said that she agreed to go to the police station for a formal interview and that her versions of the events were inconsistent. He recalled her telling four versions of the events. He denied arresting her that day. He said that the next day, Ms. Dalton called and asked to speak with him. He said she returned to the police station and provided another statement. He denied she was under arrest before giving the statement and said she voluntarily spoke to him. He said Ms. Dalton first stated that the Defendant, Mr. Johnstone, and Christian were involved in the attack but confessed she was present, not Christian. He said he was able to corroborate Ms. Dalton's last statement.

Detective Davis testified that he knew the Defendant was not in a rehabilitation program when the attack occurred because witnesses saw her at the victim's shop near the time of the attack and because Ms. Dalton's statements placed her at the scene. He agreed the Defendant checked herself into a rehabilitation program that day and said she was arrested when she was released. He interviewed the Defendant on May 15, 2012. The video-recorded interview was played for the jury.

In the recording, the detective read the Defendant her *Miranda* rights. The Defendant stated she understood her rights and did not have questions, and she signed the waiver of rights form. The detective told her the victim was assaulted and robbed. She agreed she called the victim "papaw" and asked if he was okay. The detective told her that he anticipated the victim would survive. The detective asked why the victim was assaulted. The Defendant said that she was on probation and that she was able to get into a rehabilitation program. She said that her daughter dropped her off at St. Mary's Hospital at 10:30 a.m. and that she was there all day. The detective told her that he knew the Defendant was not at St. Mary's all day, and she admitted she went to the victim's shop to tell him the wood was on the way. She said the victim was cutting wood with a saw when she was there. She said she visited the victim almost daily. She said she left and went to the hospital. When the detective asked about her parking in a nearby parking area, she said she did not remember that part.

The Defendant said Mr. Johnstone got mad at her but she could not recall the reason. She said Ms. Dalton and Mr. Johnstone jumped out of the car. She said that nobody was supposed to have been hurt and that she did not know "he" had done it until he returned to the car. She said that when Mr. Johnstone returned, his face was red. She said that Mr. Johnstone was bleeding, that she asked why, and that he said he did not know. Ms. Dalton finally arrived and told the Defendant that Mr. Johnstone hit the victim on the head. The Defendant admitted that she returned to the victim's shop but that a woman was there. She denied knowing what to do and said she would not hurt the victim.

The Defendant denied returning to obtain the victim's other wallet and said she did not have anything to do with the assault. She denied a plan existed to attack and rob the victim. She said she was on probation and would not do anything to get into trouble. She said that she had no right to hurt him and that it was not planned. She said all she wanted was to bring the victim things in exchange for money. She said the plan was to deliver wood to the victim. She said that they went to the park after leaving the victim's shop and that the victim was cutting wood when she was there. She said that Mr. Johnstone became angry with her and that he wanted to pull into the parking area for him to "cool off." She pulled into the parking area. She said that Mr. Johnstone got out of the car and walked around the area, that Ms. Dalton got out of the car to talk to Mr. Johnstone, and that she remained in the car. She said a van with dogs inside was also parked there.

The Defendant denied knowing what happened to the victim's wallet. She denied knowing the victim had his wallet that day until her husband told her the victim had been robbed. The detective told her that Ms. Dalton and Mr. Johnstone were telling the same story. She said she did not recall a plan. She wanted to know what she could do to help

herself. The detective told her he could not help someone who was unwilling to tell the truth or who was not remorseful. She said she only drove the car.

The Defendant denied returning to obtain the victim's wallet or to kill the victim. She said Mr. Johnstone and Ms. Dalton might have had a plan and denied she knew what the plan was. She said, though, that "we weren't planning on killing him" and that "he was not supposed to have gotten hurt." She denied stealing from the victim. She said Ms. Dalton "knew about it." She said she became upset when she learned Mr. Johnstone hit the victim and agreed she returned to check on the victim. She wanted to check on him but said a woman was already there. She said she was scared.

The Defendant said they left the house that morning and took her husband to work. She said she bought a pill and went to the victim's shop to say hello. She said she went home and that when there, she talked to Ms. Dalton. She said Mr. Johnstone told them that they should go to the victim's shop and "grab his billfold." She said she thought he was "playing" but said, "I guess he wasn't." She said they left and drove to the victim's house. She said she got out of the car and talked to the victim for about fifteen minutes. She said "this would have never happened" if the victim had listened to her. She said she returned to her car and left. She said Mr. Johnstone was sending a text message to someone on the phone and "blew up." She pulled into the parking area, and Mr. Johnstone got out and said he was going to take the victim's wallet. She said she thought Ms. Dalton ran after Mr. Johnstone but could not stop him. She said Mr. Johnstone had already hit the victim when Ms. Dalton arrived.

The Defendant said that after she no longer heard the victim's saw, she drove to turn down the victim's driveway. She said Mr. Johnstone and Ms. Dalton returned and jumped into the car. The Defendant said that she asked what happened and that Ms. Dalton said Mr. Johnstone "just ripped . . . off" the victim. She said that she told them she was going to check on the victim, that she saw the van at the victim's shop, and that she decided to drive away. She said she did not know where the wallet was. She said the only thing she knew was that Mr. Johnstone "ripped off" the victim. The detective told her that he found the wallet, and she asked where it was found. She denied seeing Mr. Johnstone throw the wallet out the car window or touching the wallet. She said the wallet was chained to the victim's pants and asked how Mr. Johnstone was able to get the wallet. She said she did not know because she was in her car.

The Defendant said that Mr. Johnstone handed Ms. Dalton the wallet, that Ms. Dalton opened it, and that it contained no money. She recalled seeing a photograph in the wallet but denied touching the wallet. She said, though, she told Ms. Dalton to let her see the wallet and touched it. She said it took her a minute to remember things because she had taken a lot

-12-

of drugs in her life. She denied lying to the detective. She said Ms. Dalton gave the wallet to Mr. Johnstone. She said Mr. Johnstone said he robbed the victim because the victim always gave the Defendant money and thought the victim had a "wallet full" of money. She said she went to rehabilitation that afternoon.

The Defendant asked the detective to tell her what Ms. Dalton and Mr. Johnstone said and that she could tell him if it was the truth. She said the victim should not have been hurt. She said she was on probation because she "got lied on by a man." She said she was convicted of theft. She apologized to the victim.

Detective Davis testified that in the recording, the Defendant said that after she no longer heard the "machine," "they" jumped into the car. He said the K-9 unit did not stop anywhere along the road. He denied finding the victim's wallet, although he told the Defendant it was found. He said he lied because he wanted the Defendant to think he had her DNA to determine if she would change her story, which she did.

On cross-examination, Detective Davis testified that the Defendant was under arrest at the time of the recorded statement. He said the purposes of the interview were to learn the truth and to determine if the Defendant would incriminate herself. On redirect examination, he stated that he obtained identical statements from the codefendants before the Defendant was interviewed and that during the Defendant's interview, he attempted to elicit the same statement. He agreed that based on Ms. Dalton's final statement, she knew the plan was to rob the victim, although she did not know Mr. Johnstone was going to strike the victim. He said Ms. Dalton's trial testimony was consistent with her final statement, except for her stating at the trial she did not know the plan was to rob the victim.

Upon this evidence, the jury convicted the Defendant of especially aggravated robbery and conspiracy to commit especially aggravated robbery. The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of twenty-two years for the especially aggravated robbery conviction and twelve years for the conspiracy conviction. This appeal followed.

The Defendant contends that the evidence is insufficient to support her convictions. Although she concedes the evidence shows that a robbery occurred and that Mr. Johnstone and Ms. Dalton were involved in the robbery, she argues the evidence fails to show her direct participation. She also argues the evidence fails to show that she was present when Mr. Johnstone attacked the victim and took his wallet and fails to show that she intended or knew Mr. Johnstone would use a weapon during the attack. Likewise, she argues the evidence fails to show the victim suffered serious bodily injury. The State responds that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Especially aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" accomplished with a deadly weapon and when the victim suffers serious bodily injury. T.C.A. § 39-13-403, -401 (2010). Serious bodily injury is defined, in relevant part, as a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. *Id*. § 39-11-106(a)(34)(A)-(E) (2010). "The distinction between 'bodily injury' and 'serious bodily injury' is generally a question of fact for the jury and not one of law." *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

Conspiracy is defined as "two . . . or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one . . . or more of them will engage in conduct that constitutes the offense." T.C.A. § 39-12-103(a) (2010). The State is required to allege and prove an overt act in pursuance of the conspiracy was committed by the defendant or by another with whom the defendant conspired. *Id*. § 39-12-103(d). The State is not required to establish that a formal agreement existed between the parties. *State v. Carter*, 121 S.W.3d 579, 589-90 (Tenn. 2003). The evidence must establish, though, "'a mutual implied understanding . . . , although not manifested by any formal words, or by a written agreement.'" *Id*. at 590 (quoting *Randolph v. State*, 570 S.W.2d 869, 871

(Tenn. Crim. App. 1978)). Conspiracy "'may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise.'" *Id.*

Regarding the especially aggravated robbery conviction, the Defendant concedes that a robbery occurred but argues that the victim did not suffer serious bodily injury. In the light most favorable to the State, the record shows that although the victim had a previous shoulder injury and arthritis in his left arm, the jury could have found beyond a reasonable doubt that he suffered serious bodily injury as a result of the attack. The victim described the pain he felt after he was struck multiple times with a metal pole. Although he did not lose consciousness, he suffered two broken bones and head trauma. He received stitches and required overnight hospital treatment. He was required to wear a sling for his broken bones. He said that after the assault, he was no longer able to use his arm. The photographs of the victim's injuries show the extent of the arm injury, including large amounts of blood and a protruding elbow. We conclude that the evidence shows that the victim suffered protracted loss or substantial impairment of a bodily organ because of the loss of the use of his arm. *See* T.C.A. § 39-11-106(a)(34)(E).

Regarding the Defendant's participation in the robbery and assault, the evidence shows in the light most favorable to the State that the Defendant conspired to rob the victim. Ms. Dalton testified that after she, the Defendant, Mr. Johnstone, and Christian returned home from her doctor's appointment, she saw the Defendant, Christian, and Mr. Johnstone talking. The Defendant and Mr. Johnstone went outside and got into the Defendant's car. Ms. Dalton followed them and got into the car. The Defendant drove them to the victim's shop. After they arrived, the Defendant left the car and acted "like she was using the phone." They left the area and drove to the Clayton Home parking lot. At that point, the Defendant looked at Ms. Dalton and Mr. Johnstone and said, "Okay." Mr. Johnstone pulled out gloves, gave Ms. Dalton a pair, got out of the car, picked up a metal pole, walked up behind the victim, struck him multiple times with the pole, and took one of the victim's wallets. When Ms. Dalton and Mr. Johnstone returned to the Defendant's car, the Defendant realized that the wrong wallet was taken. Ms. Dalton recalled that the Defendant's car's engine was running when she returned. The Defendant demanded to see the wallet and told Mr. Johnstone that he grabbed the wrong wallet. The Defendant explained that the victim had two wallets and kept them in separate pants pockets. The Defendant threw the wallet at Ms. Dalton and told her to wipe off the fingerprints. Although the Defendant stated that she wanted to return to the victim's shop to ensure he was uninjured, Ms. Dalton thought she wanted to return for the correct wallet.

The evidence also shows that the Defendant previously discussed robbing the victim with Ms. Dalton, Mr. Johnstone, Ms. Monnett, and Mr. Monnett. Ms. Dalton said the Defendant discussed with her and Mr. Johnstone robbing the victim three or four days before

-15-

the attack. Likewise, the Defendant assigned them roles for the robbery. The Defendant wanted Mr. Johnstone to strike the victim on the head and Ms. Dalton to grab the wallet. Although Ms. Dalton denied knowing they were going to victim's shop when they left home that day, she said she "kind of figured" the plan was to rob the victim.

Likewise, the Defendant discussed robbing the victim with Mr. and Ms. Monnett. Ms. Monnett testified that when she and her husband lived with the Defendant for a short time in 2011, the Defendant asked them to help rob the victim. Ms. Monnett said the Defendant planned to hit the victim on the head and take his money. She said the Defendant wanted the victim's money but wanted someone else to take it. Mr. Monnett testified similarly about the Defendant's asking him to hit the victim on the head with a piece of wood and to take the victim's money.

We conclude that sufficient evidence exists showing an understanding that Ms. Dalton and Mr. Johnstone would hit the victim and take his wallet while the Defendant waited inside her car. Likewise, sufficient evidence exists showing that the offense was planned days in advance and that the Defendant knew Mr. Johnstone would hit the victim with a weapon. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE